UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RICHARD RALSER                                CIVIL ACTION

VERSUS                                        NUMBER: 19-1359

HUDSON GROUP (HG) RETAIL, LLC, ET AL.         SECTION: "G"(5)

## ORDER AND REASONS

Before the Court is the Motion for Summary Judgment filed by Defendants, Hudson Group (HG) Retail, LLC and New Orleans Air Ventures II (collectively "Hudson"). (Rec. doc. 18). Plaintiff, Richard Ralser, has filed an opposition memorandum (rec. doc. 21) and Hudson filed a reply memorandum. (Rec. doc. 25). The Court heard oral argument on November 13, 2019. (Rec. doc. 27). After thorough consideration of the pleadings, the law, the facts, and the arguments of counsel, the Court rules as follows.

### I. THE RELEVANT FACTS

#### A. *Undisputed Facts*[1]

Hudson operated concessions at the New Orleans International Airport, employing Plaintiff as Assistant General Manager ("AGM") for Airport concessions from May 7, 2014 until March 16, 2018. At the time of Plaintiff's hire, Hudson also employed Janice Scott (an African American female and Hudson employee since 1997) as an AGM. Gina Trevino, a white female, served as General Manager ("GM") at that time and was responsible for

---

[1] Consistent with Local Rule 56.1, Hudson accompanied its memorandum with a "separate and concise statement of the material facts which the moving party contends present no genuine issue." (Rec. doc. 18-7). Pursuant to Local Rule 56.2, Plaintiff accompanied his opposition memorandum with a "separate and concise statement of the material facts which the opponent contends present a genuine issue." (Rec. doc. 21-1). Plaintiff objected only to Hudson's statements of fact numbers 7, 10, 16, 19, 21, 23, and 25. (*Id.*). Accordingly, pursuant to Local Rule 56.2, the remaining statements of undisputed facts submitted by Hudson are deemed admitted for purposes of the present summary judgment motion. LR 56.2. This account of the relevant facts is therefore taken from those statements of Hudson that are deemed admitted by Plaintiff.

supervising Plaintiff's and Scott's work.  Later, Gina Trevino left New Orleans and Lee Barrett ("Barrett"), a white male, took over as GM of Hudson's operations and Plaintiff's supervisor until around April 2016, when he was replaced by Carol McElheney ("McElheney"), an African American female.

Just prior departing as GM in 2016, Barrett gave Plaintiff a poor performance review.  Despite being aware of this poor review, McElheney did not dismiss Plaintiff when she became GM, instead giving him an opportunity to continue in his position as an AGM.

During McElheney's tenure as GM, Plaintiff complained to her about his co-worker, Scott, asserting that Scott did not carry her weight as an AGM.  McElheney believed that Plaintiff's performance was significantly better than Scott's and expressed that she was in favor of dismissing Scott in 2017.  Conversely, McElheney sent Plaintiff to work at other airports, discussed with him whether he was interested in taking an available GM position in Mobile, Alabama, and obtained approval to offer him that position, which he declined.

McElheney was promoted to Regional Vice President in January of 2017 and was replaced as GM by Anthony Griffin (an African American male).  After her promotion, on numerous occasions, McElheney discussed with Bob Napoli, a Senior Vice President of Hudson, the possibility of promoting Plaintiff to the GM position in New Orleans.  She did not discuss with Mr. Napoli promoting Ms. Scott to the GM position in New Orleans.  In December of 2017, McElheney requested and obtained a $5,000 raise for Plaintiff.  Scott did not receive such a raise.

Also in December of 2017 Mr. Griffin was replaced as GM by Sam Kogos ("Kogos"), a white male.  Kogos served in that position until February of 2018, at which time the GM position became vacant.  To a large extent, Plaintiff's complaints regarding the hostile work

environment to which he was subjected and his claim that he was fired in retaliation for complaining about that environment arise from events that occurred after the GM position came open and was not filled. Also to a large extent, the parties disagree about several events that occurred around that time.

    *B. Disputed Facts[2]*

Following Kogos' departure as GM in February of 2018, Plaintiff alleges that McElheney "leaned on Mr. Ralser to perform most of the duties of the General Manager, but he was not considered for promotion to the position." (Rec. doc. 21 at p. 3). Specifically, he alleges that he "was assigned [by McElheney] to deal with special projects and problems regarding video advertising boards, clean up an area of the warehouse, to investigate an injury involving one of the Dunkin Donuts employees,[3] and to do performance evaluations for the Dunkin employees." (*Id.*). Conversely, Plaintiff alleges, "the other Assistant General Manager, Janice Scott, was not given additional general manager duties." (*Id.*). He attributes this disparate treatment to his being a white male whereas Scott and McElheney are African American females. (*Id.* at 1, rec. doc. 21-2 at p. 2).

In addition to these indignities, Plaintiff alleges that "Ms. McElheney began a pattern of unjustly blaming Mr. Ralser for the consequences of her and other managers' failure to perform and share information." (*Id.* at p. 4). For example, concerning 2017 employee evaluations, McElheney "waited several days before she passed the assignment to perform

---

[2] Plaintiff's version of these events is taken from his declaration filed in support of his opposition memorandum and from his affidavit submitted to the EEOC in support of his charge. (Rec. doc. 21-2 at pp. 1-14). Plaintiff also submitted as summary judgment support emails he sent to himself "memorializing" certain events in his own words. The Court does not consider these latter emails, which are unsworn hearsay statements, as appropriate evidence submitted in support of his position.

[3] According to Plaintiff's EEOC charge, Hudson operated certain Dunkin Donuts stores at the Louis Armstrong Airport. (Rec. doc. 21-2 at p. 13).

3

evaluations on several employees to me with only one day before the deadline set by corporate. Then she instructed me not to perform evaluations on several individuals who should have been given evaluations according to company policy. She gave me no explanation to give the lower level managers and employees about why they were not all getting evaluations." (Rec. doc. 21-2 at p. 13).

Another example cited by Plaintiff of McElheney's "unfairly making Mr. Ralser look bad for her failure or the failure of her preferred non-white managers" involved an episode in which Dunkin store management instructed its store employees to dispose of some yogurt due to "major food safety issues." (*Id.* at p. 4). According to Plaintiff (who claims he was never informed about the instruction), when that instruction was not heeded and the Dunkin managers emailed McElheney and him to ensure the yogurt got destroyed, McElheney responded to the email in part by stating "[a]lso, Richard the AGM could have handled." (*Id.*). According to Plaintiff, "this was one of several recent instances of Ms. McElheney blaming me for problems that she knew I did not cause." (*Id.*).

Sometime in February 2018, Plaintiff claims he came to work to find Ms. McElheney and another African American manager, Anthony Griffin, in Griffin's office laughing. (Rec. doc. 21 at p. 3). Plaintiff claims that when he greeted the two, McElheney said, "Oh no, Richard I can't take too much more of this." (*Id.*). When Plaintiff asked if she was talking to him, McElheney allegedly said, "Yes. Your president is sleeping with a porn star" and began laughing with Griffin. (*Id.*). Plaintiff claims that he found this comment to be disrespectful, inappropriate, and racial, a "racist assumption" that he supports the President merely because he is white. (*Id.*).

Ralser claims that at some point after McElheney's "Trump" comment, he complained about McElheney's "preferential treatment toward certain people as well as her making racial and inflammatory remarks about President Trump being 'your president'" to Joe Aiello, a Dunkin Donuts Manager. (Rec. doc. 21 at p. 4).[4]

Thereafter, on March 15th or 16th, Plaintiff alleges he was called into a meeting with McElheney and Cynthia Newton, the white Regional Human Resources Manager at Hudson. (Rec. doc. 21 at p. 5). According to Plaintiff, McElheney began the meeting by telling Plaintiff he needed to do a better job of controlling overtime, to which Plaintiff responded that "that Janice Scott was supposed to be an [A]ssistant [G]eneral [M]anager equal to him, although Ms. McElheney gave her preferential treatment to do whatever she wanted. He complained that all the work is delegated to him. All the responsibility and projects were delegated to him." (*Id.*). Plaintiff further alleges that, in response to these statements, McElheney asked him "Let me get this right Richard, you're telling me I give Janice preferential treatment because I am black and female, and Janice is black and female," to which Plaintiff allegedly responded "Yes that's correct." (*Id.*).

What happened next is in serious dispute. Defendants, who claim the meeting was called to issue Plaintiff a written warning about his performance, in particular his "lack of communication and poor interpersonal skills with those whom he supervised," allege that Plaintiff "became irate, stood up and threw the papers onto the desk in front of Ms. McElheney while yelling profanities and gesticulating." (Rec. doc. 18-1 at p. 4). Defendants claim he was thereafter escorted out of the meeting and that, after consultation between

---

[4] While Plaintiff alleged in his EEOC charge that Aiello (whom he referred to in that document as "Alero") was an employee of Hudson, there is no evidence that Aiello was a decisionmaker regarding Plaintiff's employment.

5

McElheney; Newton; Robert Napoli, Senior Vice President of Hudson ("Napoli"); and John Flaim, Senior Director of Human Resources for Hudson, the decision was made to terminate Plaintiff for his inappropriate conduct at the meeting. (*Id.*).

Plaintiff, on the other hand, claims that after he confirmed to McElheney his belief that her treatment of him was based on his race, that she called Napoli and said "Bob, I'm sitting here having a conversation with Richard and he's telling me it's all racial." (Rec. doc. 21 at p. 6). He alleges this statement to Napoli was "confirmation" of his complaint of racial discrimination to McElheney. (*Id.).* He further alleges that McElheney informed him that he would not be getting an evaluation the next month because his performance was below standard and that he thereafter "calmly got up and left" without being escorted from the building. (*Id.*).

The parties agree that Scott was also eventually terminated for poor job performance on April 24, 2018, just over a month after Plaintiff's termination.

## II. LAW AND ANALYSIS

### A. *Summary Judgment Standard*

Summary judgment is appropriate "only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' when viewed in the light most favorable to the non-movant, 'show that there is no genuine issue as to any material fact.'" *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248). The court must draw

all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255).

"Once the moving party has initially shown 'that there is an absence of evidence to support the non-moving party's cause,' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *Id.* (citing Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)). Additionally, if the nonmoving party would bear the burden of proof of the dispositive issue at trial, then the moving party can satisfy its burden by proving that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *Celotex*, 477 U.S. at 325.

### B. *Discrimination/Hostile Work Environment*

Although less than entirely clear from the pleadings, Plaintiff has conceded through counsel that his race discrimination claim is based solely on what he alleges was a hostile work environment arising from race discrimination against him. (Rec. doc. 21 at p. 10 ("Plaintiff only intends to assert a hostile work environment claim for discrimination")). Moreover, he has conceded that the relevant time period during which the hostile work environment existed was the time between Kogos' departure and Plaintiff's termination – February of 2018 until March 15 or 16, 2018. (Rec. doc. 31 at pp. 18-19).

"A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to

7

alter the conditions of the victim's employment and create an abusive working environment.'" *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

To establish a claim of hostile work environment under Title VII, a plaintiff must prove that he:

> (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.
>
> *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir.), *cert. denied*, 586 U.S. 817 (2012)(quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

"Hostile work environment" racial harassment occurs when an employer's conduct "'has the purpose or effect of <u>unreasonably</u> interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. § 1604.11(a)) (emphasis added).

> In order to find a workplace severely pervasive for harassment and hostile work environment to be actionable, courts consider a totality of the circumstances, including the frequency of the conduct, its severity, and whether it was physically threatening or humiliating, or a mere offensive utterance. The work environment must be both subjectively and objectively offensive—one that a reasonable person would find hostile and one the victim found offensive.
>
> *Williams v. Clegg's Nursery, LLC*, 2016 U.S. Dist. LEXIS

87836 at *39 (M.D. La. July 7, 2016).

Defendants argue that Plaintiff cannot satisfy the third and fourth elements of a *prima facie* case of discriminatory hostile work environment because he cannot establish that McElheney's complained-of conduct was based on race or that her alleged actions were so severe or pervasive that they affected a term, condition, or privilege of employment. For the following reasons, the Court agrees.

In his opposition memorandum filed in response to Defendants' motion for summary judgment, Plaintiff's argument in support of his hostile work environment claim is comprised of but a single paragraph:

> Plaintiff only intends to assert a hostile working environment claim for discrimination. Plaintiff suffered a racial comment from his supervisor in the same month that he was required to do the GM job without consideration for the promotion, while the other AGM was given easier assignments, and his manager set him up to look bad on numerous occasions. As shown in Mr. Ralser's Declaration, as the only white manager, he was singled out for blame while the other managers were protected. The racial comments by Mr. McElheney, combined with her effort to unfairly hurt his reputation, hurt Plaintiff's ability to focus on his job duties.

(Rec. doc. 21 at p. 10).

This is Plaintiff's <u>entire argument</u> in support of his discrimination claim and it reveals a fatal lack of evidence of race-based harassment that had the "purpose or effect of <u>unreasonably</u> interfering with [Plaintiff's] work performance or creating an intimidating, hostile, or offensive working environment.'" *See Meritor Sav. Bank, FSB*, 477 U.S. at 65.

Before turning to Plaintiff's allegation regarding the "racial comment," *i.e.*, the "your president" comment, the Court addresses the notion that McElheney's requiring Plaintiff to

9

"do the GM job without consideration for the promotion, while the other GM was given easier assignments" was race-based discrimination or harassment. Simply, there is no evidence to establish that this conduct was based on race. Plaintiff and his counsel, both in brief and at the hearing, have leaned on the fact that he was treated differently than Scott, an African American woman, which in and of itself is said to be evidence of race-based discrimination. But as the Court pointed out at the hearing, it is undisputed that at the end of 2017, Plaintiff was given a $5,000 raise – at the recommendation of McElheney – and Scott was not. So while the two may have had similar job titles and even similar job duties, Plaintiff was admittedly being paid more than Scott and might therefore be expected to be given some more difficult assignments than Scott while the GM position was vacant.

In the same vein regarding Plaintiff's complaints about being made to "look bad" by McElheney, even if they are true (and the Court of course takes the Plaintiff's factual allegations to be true in the summary judgment context), there is simply no evidence linking McElheney's conduct to Plaintiff's race. The controversies surrounding the employee evaluations McElheney assigned to Plaintiff at the eleventh hour and the "tainted yogurt" episode may have been viewed by Plaintiff as unfair, but there is zero evidence – direct or circumstantial – that either episode was related to his race.

Which brings us to the "your president" comment. Importantly, the comment on its face is race-neutral, yet Plaintiff takes McElheney's reference to President Trump as "your" president to be a "racial assumption." (Rec. doc. 21 at p. 3). While that may have been Plaintiff's takeaway, the actual comment itself refers to the President and does not mention race at all. Indeed, the person making the "racial assumption" here is Plaintiff and such assumptions do not carry the day in defeating summary judgment on claims such as this one.

Even if the Court were to find that there was some evidence connecting the Defendants' complained-of conduct to racial animus toward Plaintiff sufficient to establish the third element of the *prima facie* case of hostile work environment, it is clear that that conduct does not rise to the level necessary to satisfy the fourth – that the workplace be "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive" so as to affect a term, condition, or privilege of employment. *See Stewart*, 586 F.3d at 328.

Turning again to the supposedly "racial comment" about the President, it is indeed true that racially "discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII." *Mire v. Tex. Plumbing Supply Co., Inc.*, 286 Fed.Appx. 138, 141 (5th Cir. 2008).

To survive summary judgment on a hostile work environment claim based on race and race-based insults or comments, the nonmovant must create a fact issue as to each of the following elements: "(1) racially discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment." *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Whether a work environment meets these criteria depends upon the totality of the circumstances. *See Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 23 (1993)). In other words, "to establish a viable hostile work environment claim, the plaintiff must present more than a few isolated incidents of racial enmity." *Brooks v. Firestone Polymers, LLC,* 70 F.Supp.3d 816, 857 (E.D. Tex. 2014) (internal citations omitted).

Here, Plaintiff admits that McElheney's single comment about President Trump was the first and only "racially discriminatory" comment she ever made to him. (Rec. doc. 18-5 at p. 37). Simply stated, this single comment cannot conceivably be considered "severe or pervasive" enough to pass muster. As noted above, on its face, the comment is race-neutral. And even crediting Plaintiff's argument that he perceived some implicit racial undertone to the reference to Donald Trump as "your president," this one-time, benign comment pales in comparison to other more inflammatory comments that have been found to support hostile work environment claims.[5]

The "President Trump" comment, then, carries insufficient weight alone. It can only conceivably carry any weight if it combines sufficiently with other discriminatory conduct in "totality" to be considered "objectively and subjectively offensive." *Shepherd v. Comptroller of Pub. Accounts of State of Texas*, 168 F.3d 871, 874 (5th Cir.), *cert. denied*, 528 U.S. 923 (1999) (citing *Harris v. Forklift*, 510 U.S. 17, 21–22 (1993)). Notwithstanding that the Court has already found a lack of evidentiary support to establish that Plaintiff's other complaints of discrimination were based on race, a brief examination of those complaints in the context of the "severe and pervasive" analysis is warranted.

---

[5] *See, e.g., Walker*, 214 F.3d 615 at 625 (holding that plaintiff survives summary judgment where evidence demonstrated years of inflammatory racial epithets, including "n****r" and "little black monkey"); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1266 (7th Cir. 1991) (finding summary judgment for defendant inappropriate where plaintiff was subjected to "n****r jokes" for a 10-year period and whose workstation was adorned with "a human-sized dummy with a black head"); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182 (4th Cir. 2001) (reversing summary judgment where plaintiff suffered "incessant racial slurs" including "n****r" and "dumb monkey"); *but see Pickens v. Shell Tech. Ventures, Inc.*, 118 Fed.Appx. 842, 850 (5th Cir. 2004) (holding that a company Christmas party where a skit with characters in blackface was performed and racially insensitive comments were made did not create a hostile work environment); *Mosley v. Marion County, Miss.*, 111 Fed.Appx. 726, 728 (5th Cir. 2004) (three incidents involving the use of racial slurs were insufficient to establish a hostile work environment claim).

First of all, Plaintiff complains of allegedly discriminatory conduct that occurred between Kogos' departure on February 19, 2018 and Plaintiff's own termination on March 15 or 16, 2018. This is a period of less than one month. While it is certainly possible to imagine a level of harassment occurring in such a short period of time that could rise to the level necessary to satisfy the "severe and pervasive" element of the *prima facie* case, such harassment would no doubt have to be egregious. It is simply not possible to find that the inconveniences and mundane slings and arrows to which Plaintiff was exposed for less than a month were capable of creating or did create a work environment "both subjectively and objectively offensive—one that a reasonable person would find hostile and one the victim found offensive." *See Williams*, 2016 U.S. Dist. LEXIS 87836 at *39.

No reasonable person who has spent any time in the workplace could find the handful of unpleasant episodes that Plaintiff complains about to be objectively hostile, even if they were based on his race. And, notably, Plaintiff has not cited the Court to a <u>single</u> case to support his contention that these various episodes rise to an actionable critical mass of discriminatory conduct.

Because Plaintiff cannot establish that any of the complained-of conduct was based on race or racial animus or that he was subjected to racial harassment so severe and pervasive that it affected a term, condition, or privilege of his employment, his discriminatory hostile work environment claim fails.

### C. Retaliation

Plaintiff's other claim against Defendants is for retaliation, *i.e.*, that he was terminated by Hudson in retaliation for his complaining to his superiors about McElheney's discriminatory treatment of him.

A plaintiff establishes a prima facie case for unlawful retaliation by proving: (1) that he engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action. *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996); *see also McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116 (5th Cir. 1983). An employee has engaged in activity protected by Title VII if he has either: (1) "opposed any practice made an unlawful employment practice" by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). *Id.* The opposition clause of § 2000e–3(a) requires the employee to demonstrate that he had at least a "reasonable belief" that the practices he opposed were unlawful. *Id.*, *see also Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 1000 (1982).

Plaintiff correctly points out that "[i]t has long been the law in this and other circuits that a plaintiff contending that [he] was retaliated against for proactively reporting employment discrimination need not show that the discrimination rose to the level of a Title VII violation, but must at least show a reasonable belief that it did." (Rec. doc. 21 at p. 7) (citing *Equal Emp't Opportunity Comm'n v. Rite Way Serv., Inc.*, 819 F.3d 235 (5th Cir. 2016)).

The threshold question for the Court here is whether, when Plaintiff complained about McElheney's treatment of him to McElheney and Newton, he had a "reasonable belief" that she had violated Title VII. While the Court has already found that Plaintiff cannot establish the elements of his underlying hostile work environment claim, such a finding does not necessarily mean summary judgment will be appropriate on Plaintiff's retaliation claim. *See, e.g., Rite Way Serv.*, 819 F.3d at 243-44.

Leading up to the "your president" comment by McElheney, the allegedly discriminatory conduct complained of by Plaintiff is limited to a period of no more than three months in which McElheney allegedly: (1) asked Plaintiff to "perform the additional [GM] duties without receiving the title or pay raise associated with the higher level position" and (2) blamed Plaintiff for "the shortcomings of herself and the rest of her management team, all of whom were not white." (Rec. doc. 21 at p. 8). Plaintiff adds that McElheney's one-time comment about Donald Trump being "his" president would "influence a reasonable person's interpretation of Ms. McElheney's disparate treatment in terms of job assignments and unfair attempts to pin blame on Mr. Ralser while protecting the black managers." (*Id.* at p. 7). For a number of reasons, the Court disagrees that any reasonable person could interpret these experiences, taken together and in context, as violative of Title VII.

While Plaintiff continuously complains of McElheney's "disparate treatment" of him, especially as compared to her treatment of Scott, those complaints ignore a number of important undisputed facts that bear upon whether he could have reasonably believed that treatment was the product of racial discrimination. First and foremost (and contrary to Plaintiff's counsel's argument otherwise), Plaintiff has conceded that he <u>always</u> believed he was being unfairly treated differently from Scott throughout their tenures at the airport. The following testimony of Plaintiff is telling in this regard:

> Q. O.K. When did that – this preferential treatment, you're describing, when did that begin?
> A. Since Day One when Carol was GM.
>
> Q. O.K. So was Ms. Janice Scott working with you as AGM, prior to when Ms. McElheney started?
> A. She was.

> Q. Was she being treated any differently at that time, before Ms. McElheney started working as GM at New Orleans Retail Operations?
> A. <u>I can say the work was never distributed fairly while I worked with Janice Scott -- the entire time -- at New Orleans Airport.</u>
>
> Q. Isn't the reason for that, that she was not as able as you were to perform well?
> A. We all accepted the job, and accepted the position. She said yes to the position, just like I said yes to the position. Now, if she had any kind of medical conditions, or reasons why she couldn't, I'm not aware of it.
>
> Q. O.K.
> A. But as far as holding an Assistant Manager's position, she should be held at the same standard as I am, if she's going to hold that same position.
>
> Q. Do you -- do you believe that she performed as well as you did in the position of Assistant General Manager?
> A. No.
>
> Q. Do you know whether Ms. McElheney thought that she did not perform as well as you did?
> A. Ms. McElheney was well aware that she didn't perform as well as I did.
> . . . .
> Q. If I understand you correctly, <u>this is from the moment you started working as AGM, that Ms. Scott received what you considered to be preferential treatment; is that right?</u>
> A. <u>Correct.</u>

(Rec. doc. 18-5 at pp. 13-14).

Plaintiff testified very clearly that he believes that Scott was treated more favorably than him "from the moment he started working as AGM" at the airport. A review of the facts surrounding that employment tenure is important here.

When Plaintiff was hired in May of 2014, the GM (and his supervisor) was Gina Trevino, a white woman. (Rec. doc. 18-5 at p. 7). When Trevino left, she was replaced as GM

16

(and Plaintiff's supervisor) by Lee Barrett, a white male. (*Id*. at p. 9). McElheney replaced Barrett in April 2016, but not before Barrett, the white male GM, submitted an unfavorable written performance review of Plaintiff, which he shared with McElheney. (Rec. doc. 18-7 at p. 2). Despite this unfavorable review from Plaintiff's former supervisor, McElheney, the new African American female GM, did not dismiss Plaintiff but kept him on with an opportunity to continue his position as AGM. (*Id.*). And not only did McElheney retain Plaintiff, she recommended and obtained for him a $5,000 raise in December of 2017, one year and eight months after she first began supervising him. (*Id.* at p. 4). Scott, on the other hand, received no such raise. McElheney was followed in the GM position by Sam Kogos, another white male. (*Id.*).

Over the period of time during which Plaintiff claims to have been treated less favorably than Scott, he was supervised by three white GMs and one African American GM, McElheney, who also happens to be the only GM who sought and obtained a $5,000 raise for Plaintiff (a mere three months before his departure). Under these facts, no reasonable person in Plaintiff's position could believe that any disparate treatment of him as compared to Scott could have been the result of racial animus or bias.

According to his brief, Plaintiff was retaliated against for complaining of race discrimination at the March 15th or 16th meeting, a complaint he describes as follows:

> On March 15 or 16, Mr. Ralser was called into the meeting with Ms. McElheney and Ms. Newton. Ms. McElheney began to tell Mr. Ralser that he needed to do better to control overtime, Mr. Ralser responded that Janice Scott was supposed to be an assistant general manager equal to him, although Ms. McElheney gave her preferential treatment to do whatever she wanted. He complained that all the work is delegated to him. All the responsibility and projects were delegated to him. Ms. McElheney responded by asking, "Let me get this right Richard, you're telling me I give Janice preferential treatment because I

17

am black and female, and Janice is black and female?" Mr. Ralser said "Yes that's correct."

(Rec. doc. 21 at p. 5).

Even if Plaintiff actually believed that McElheney was treating him differently because he was a white male and she was an African American female, that belief could not be objectively reasonable considering all the circumstances set forth above.

The same must be said of the "your president" comment. There is nothing overtly racial or facially offensive about the comment. Plaintiff explains in his affidavit that:

> I was offended by her assumption that Trump was "my president" because I am white. This made me see that Ms. McElheney did not see me as an Assistant General Manager but saw me as a White Assistant Manager. The fact that she did this in front of one of our black management colleagues made it clear to me that I was not part of her "in group" that made the jokes, but instead I was the butt of the joke.

(Rec. doc. 21-2 at p. 8).

Again, while Plaintiff may have made the assumption that McElheney's comment about the President was race-based and he may been subjectively "offended" by it, the Court's task is to determine whether a reasonable person in Plaintiff's circumstances could have interpreted this single comment as having violated Title VII.[6] The Court has no choice but to answer that question in the negative. And in the final analysis, even taking this stray comment together with all of Plaintiff's other complaints – and assuming they are all true – the Court finds there is no critical mass of indignities that rises to the level sufficient to have given the Plaintiff a reasonable belief that McElheney was discriminating against him because of his race.

---

[6] It is worth remembering that Plaintiff conceded this was the first and only "racially discriminatory" comment McElheney ever made to him. (Rec. doc. 18-5 at p. 37).

Accordingly, because the Court finds that Plaintiff did not engage in an activity protected by Title VII, it must find that his retaliation claim is fatally flawed and that it should be dismissed.

### D. Abuse of Rights

Because Plaintiff included a claim under the Louisiana abuse-of-rights doctrine, the Court briefly addresses it here, although he made no serious effort to support that claim in response to Defendants' summary judgment motion.

The abuse-of-rights doctrine "is a civilian concept which is applied only in limited circumstances because its application renders unenforceable one's otherwise judicially protected rights." *Truschinger v. Pak*, 513 So.2d 1151, 1154 (La. 1987). It is sparingly applied by Louisiana courts and then only when one of the following conditions is satisfied: (1) the predominant motive for the exercise of the right was to cause harm; (2) if there was no serious or legitimate motive for exercising the right; (3) if the exercise of the right is against moral rules, good faith, or elementary fairness; or, (4) if the right is exercised for a purpose other than that for which it is granted. *See id.; Illinois Central Gulf Railroad Co. v. International Harvester Co.*, 368 So.2d 1009, 1013 (La. 1979).

Here, Plaintiff has made no real effort to establish that Defendants abused any right or that any of the conditions precedent to invoking the doctrine are present in this case. The following comprises his entire argument in support of his abuse-of-rights claim found in his opposition memorandum:

> Plaintiff's evidence satisfies the elements of abuse of rights. The summary judgment evidence shows that Ms. McElheney and Ms. Newton made up lies about his conduct in order to get him fired. The right to fire at will is not intended to allow employers to avoid the consequences of their illegal actions by making up lies to justify the termination. Thus, there is sufficient evidence of a

19

> motivation to cause harm, a lack of legitimate motive, and there is no benefit to Defendant in firing a productive employee who just got a $5,000 raise.

(Rec. doc. 21 at p. 11).

Despite referring to his "summary judgment evidence" in support of this claim, there simply is none. Plaintiff's own statements and subjective beliefs about what happened to him and why fall far short of the sort of factual support necessary to maintain the rarely invoked abuse-of-rights claim.

### III. CONCLUSION

After a thorough examination of the evidence, the pleadings, the applicable law, and for the reasons set forth above, the Court hereby grants Defendants' motion for summary judgment. Plaintiff cannot establish the necessary elements of his claims for hostile work environment, retaliation, or abuse-of-rights and, as a consequence, those claims – and this lawsuit – are hereby dismissed with prejudice. Judgment will be entered accordingly.

New Orleans, Louisiana, this __8th__ day of _____January_____, 2020.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE